UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

<u>BK and SK</u>

     v.                          Civil No. 09-cv-94-JL
                                       Opinion No. 2011 DNH 157
<u>New Hampshire Department
of Health and Human
Services <em>et al.</em></u>

**MEMORANDUM ORDER**

This action presents the question of whether private citizens can enforce certain requirements that federal law imposes on the states as a condition of funding for foster care and adoption services.  The plaintiffs claim that, in violation of these requirements, the New Hampshire Department of Health and Human Services (and other defendants) removed the plaintiffs' minor children from their home, placed them in different foster homes from each other, and failed to place them with foster families "who respected and followed [the childrens'] religious, ethnic or cultural background."

The plaintiffs, proceeding pseudonymously as BK (the childrens' father) and SK (the childrens' mother), and acting on behalf of themselves and their children, are practicing Hindi. Nevertheless, they allege that their children were placed with foster families who served them beef and took them to Christian religious services, in contravention of the plaintiffs' religious

beliefs.  They claim that this violated federal law requiring, as a condition of federal funding for state child welfare plans, a state's "diligent recruitment of potential foster and adoptive families that reflect the ethnic and racial diversity of children in the State for whom foster and adoptive homes are needed."  42 U.S.C. § 622(b)(7).  The plaintiffs also claim that the foster care placements violated their free exercise rights under the First Amendment to the Constitution.  They further claim that, through the foster placements, the defendants violated other statutory requirements for "reasonable efforts" as a condition of federal funding for state foster programs, including "to preserve and reunify families," id. § 671(a)(15)(B), and "to place siblings removed from their home in the same foster care," id. § 671(a)(31)(A).  Finally, the plaintiffs claim that the defendants negligently inflicted emotional distress on SK.

The defendants, who include the New Hampshire Department of Health and Human Services, its Division for Children, Youth and Families, one of its district offices, and a number of their employees, have moved to dismiss the plaintiffs' complaint for failure to state a claim.[1]  See Fed. R. Civ. P. 12(b)(6).  The

---

[1]After the defendants filed their motion to dismiss, the plaintiffs filed a motion to amend their complaint, which the court granted.  The defendants then filed an answer to the amended complaint and, the next month, the court granted the plaintiffs' motion to stay the action so that one of them could

defendants argue that the statutory funding requirements they are accused of violating do not confer any judicially enforceable rights on the plaintiffs, that the plaintiffs "allege no statutory vehicle for redress" of the claimed First Amendment violations, and that they do not allege sufficient facts to state a claim for negligent infliction of emotional distress.[2]   This court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 (federal question) and 1367 (supplemental jurisdiction).

Following oral argument, the defendants' motion is granted in part and denied in part.   The defendants are correct that the statutory funding requirements invoked by the plaintiffs, which require state foster care plans to provide for "reasonable

---

find substitute counsel.   During the stay, the court denied the defendants' motion to dismiss without prejudice to reinstatement following the stay; after the stay was lifted, the defendants reinstated their motion to dismiss.   Accordingly, the court will treat the motion to dismiss the complaint as a motion for judgment on the pleadings, see Rule 12(c), directed at the amended complaint.

[2]In their original complaint, the plaintiffs had brought claims under the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb ("RFRA"), which the Supreme Court has held unconstitutional as applied to the states, City of Boerne v. Flores, 521 U.S. 507 (1997).   On that basis, the defendants have moved to dismiss those claims in their reinstated motion to dismiss.   But the plaintiffs have excluded their RFRA claims from their amended complaint, and say in their reinstated objection to the motion to that they wish to "withdraw the claims without prejudice."   Since the RFRA claims do not appear in the amended complaint, however, this court will not rule on either the defendants' motion to dismiss them nor the plaintiffs' request to "withdraw" them "without prejudice."

efforts" or "diligent recruitment," are not the sort of clear congressional mandates that create privately enforceable rights and therefore cannot provide the basis for relief here.  The defendants are also correct that the plaintiffs have failed to allege a claim for negligent infliction of emotional distress on behalf of SK, because they do not allege that any of the defendants owed her a duty.  The defendants are incorrect, though, that the plaintiffs have failed to state a statutory basis for recovering for the defendants' alleged violations of their First Amendment rights, because the amended complaint specifically cites just that vehicle, 42 U.S.C. § 1983.

## I.   **Applicable legal standard**

A motion for judgment on the pleadings under Rule 12(c) is evaluated under essentially the same standard as a Rule 12(b)(6) motion for failure to state a claim.  See, e.g., Simmons v. Galvin, 575 F.3d 24, 30 (1st Cir. 2009).  To survive such a motion, the "complaint must contain factual allegations that 'raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true.'" Id. (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).  In determining whether the complaint meets that standard, the court must construe the complaint's allegations in

4

the light most favorable to the plaintiff, drawing all reasonable inferences in the plaintiff's favor.  Id.; see also Perez-Acevedo v. Rivero-Cubano, 520 F.3d 26, 29 (1st Cir. 2008).  The following facts are set forth accordingly.

## II.  Background

BK and SK, who were born in India, "are firm believers of the Hindu faith and actively practice its teachings," including treating "the cow as sacred" and not "eating beef, eating from cookware or dishes used to serve or cook beef," or "residing in households in which beef is consumed."  Their minor children, identified as "MG," "KK," and "B," have been "brought up in a home in which the cow was treated as a sacred animal and they have followed their belief throughout their lives."

At some point (the amended complaint does not say when), the plaintiffs' children were removed from their home and each was placed with a different foster family.  This was accomplished by the DCYF's Claremont District Office, through its director, Mary-Ann Babic-Keith, one of its assistant directors, Mark Rissala, and two of its social workers, Jeszadiah Eisenberg and Susan Holdsworth.  The plaintiffs allege that, though their religious faith was well-known to Rissala, Eisenberg, and Holdsworth, the children were placed with foster families who

"did not recognize [their] beliefs and [who], in fact, violated them by cooking, consuming, and serving beef."

In response, SK "offered to cook and supply food for the children" to eat while in foster care, but, the plaintiffs say, Eisenberg "rejected that offer out of hand."  The plaintiffs claim that SK eventually did give food she had prepared to B, who brought it to her foster home only to have her foster parents throw it away, and that those same foster parents sent B to school without lunch on at least one day, "informing her it was too hard to make her a lunch she could eat."

The plaintiffs further allege that "two of the children were placed in homes where they were taken to a Christian church almost weekly," including KK, who was placed in the home of "a minister, who had in the past tried to covert [*sic*]" BK.  The plaintiffs say that, when they brought this, and their children's exposure to beef while in foster care, to Rissala's attention, he claimed there were no other foster homes available--which the plaintiffs find hard to believe because they "reside in an area of New Hampshire which has residents from a multitude of relgions [*sic*], cultures and ethnicity [*sic*]."

Finally, the plaintiffs allege that SK, in particular, suffered severe emotional distress--requiring her hospitalization--not only over the removal of her children from

her home, but through the actions of certain defendants while the
children were in their foster placements.  In addition to the
defendants' failure to intervene in the foster families' alleged
violations of the childrens' religious beliefs, as just
discussed, the plaintiffs claim that Eisenberg "interfere[d]"
with the childrens' visits to SK in the hospital by interrupting
their conversations.

The plaintiffs' amended complaint is in six separately
numbered counts:

- violation of the First Amendment by placing the children
  in foster homes where beef was served (count 1);

- violation of the First Amendment by placing two of the
  children with foster families who took them to Christian
  religious services (count 2);

- violation of 42 U.S.C. § 1983 by placing the children in
  foster homes and with foster families who took them to
  Christian religious services (count 3);

- violation of 42 U.S.C. §§ 671(a)(15)(B) and 671(a)(31) by
  failing to make reasonable efforts (i) to preserve and
  reunify the plaintiffs' family and (ii) to place the
  children in the same foster home (count 4);

- violation of 42 U.S.C. § 622(b)(7) by failing to provide
  for the diligent recruitment of foster families reflecting
  the ethnic and racial diversity of children in the state
  needing foster care (count 5); and

- "negligent and reckless infliction of emotional distress"
  under New Hampshire law (count 6).

The plaintiffs seek compensatory and punitive damages.  They do
not seek any prospective relief.

7

## III. <u>Analysis</u>

As noted at the outset, the defendants move to dismiss the plaintiffs' complaint because (A) they allege "no statutory vehicle for redress" of their First Amendment claims, (B) they cannot bring claims under federal statutes that impose requirements on state foster programs receiving federal funding, because those statutes do not create any privately enforceable rights, and (C) they fail to state a claim for negligent infliction of emotional distress.  As explained fully <u>infra</u>, the defendants' second and third arguments are correct, but their first argument is not.

### A.    The First Amendment claims

The defendants argue that counts 1 and 2, alleging violations of the plaintiffs' First Amendment rights, fail to state a claim for relief because "the U.S. Constitution does not provide a private right of action," and "the plaintiffs have not alleged a statutory vehicle for seeking redress."  Of course, the "statutory vehicle for seeking redress" for "the deprivation of any rights, privileges, or immunities secured by the Constitution" is 42 U.S.C. § 1983, which specifically provides in relevant part that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State

. . . subjects or causes to be subjected, any citizen of the United States" to such a deprivation "shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

The defendants' argument for dismissal, then, is obviously not that the plaintiffs cannot bring claims against the defendants under § 1983 for violations of the plaintiffs' First Amendment rights.  So it must be that the plaintiffs have failed to cite § 1983.  This was true of the plaintiffs' original complaint, which contained counts 1 and 2, but not count 3, which, as described supra, specifically makes a claim under § 1983 for the same actions that counts 1 and 2 allege to have violated the plaintiffs' First Amendment rights.  Yet, despite the filing of the amended complaint, see note 1, supra, the defendants have reinstated their motion to dismiss in its entirety, including the argument that the plaintiffs have asserted no statutory vehicle for redress of the alleged First Amendment violations.  They were not required to in the first place, see Morales-Vallellanes v. Potter, 339 F.3d 9, 14 (1st Cir. 2003) ("A complaint need not point to the appropriate statute or law in order to raise a claim for relief") (quotation

formatting omitted), but in any event they have now.  The motion
to dismiss counts 1 and 2 on this basis is denied.[3]


**B.   The statutory claims**

     The defendants seek to dismiss counts 4 and 5 of the amended
complaint, asserting claims against them for violating federal
statutes that impose requirements on state foster programs
receiving federal funding, namely 42 U.S.C. §§ 671(a)(15)(B),
671(a)(31), and 622(b)(7), because those statutes do not create
any privately enforceable rights.  Because there is no express
statutory authorization for private citizens to bring suit under
any of these provisions, the plaintiffs may do so here only if
the statutes imply a private right of action, or create a right
enforceable under § 1983.  See, e.g., Gonzaga Univ. v. Doe, 536
U.S. 273, 283-84 (2002).  This court agrees with the defendants
that none of the provisions in question here does either.

---

     [3]The defendants have not challenged--nor has this court
considered--whether counts 1 and 2 fail to state a claim for any
other reason.

### a.   Section 671(a)(15) and (a)(31)

One of the statutes invoked by the plaintiffs, § 671(a), was initially enacted as part of the Adoption Assistance and Child Welfare Act of 1980, which amended certain provisions of the Social Security Act.  See Pub. L. 96-272, Tit. 1, § 101(a)(1), 94 Stat. 500, 503 ("AACWA").[4]  The stated purpose of the AACWA was, through the appropriation of federal funds, "enabling each State to provide, in appropriate cases, foster care and adoption assistance for children who otherwise would be eligible for assistance" under certain federal Social Security programs.  Id. (codified at 42 U.S.C. § 670).  But § 671(a) states that "for a State to be eligible for payments under this part, it shall have a plan approved by the Secretary" of Health and Human Services which contains a number a specified provisions, set forth at §§ 671(a)(1)-(31).  The plaintiffs assert violations of two of these provisions:  §§ 671(a)(15)(B) and § 671(a)(31).

---

[4]This provision was later amended as part of the Adoption and Safe Families Act of 1997.  See Pub. L. 105-89, tit. I, § 101, 111 Stat. 2115, 2116 (codified at 42 U.S.C. §§ 671(a)(15)(A)-(F)).  This amendment added, to the text of § 671(a)(15)(B), a cross-reference to § 671(a)(15)(D), but otherwise left that provision unchanged.  The provision was later amended again as part of the Fostering Connections to Success and Increasing Adoptions Act of 2008, which, in relevant part, also added § 671(a)(31).  See Pub. L. 110-351, tit. II, § 206, 122 Stat. 3949, 3962 (codified at 42 U.S.C. § 671(a)(31)).

The first of these provisions, § 671(a)(15)(B), requires a state plan to provide for "reasonable efforts shall be made to preserve and reunify families (i) prior to the placement of the child in foster care, to prevent or eliminate the need for removing the child from the child's home; and (ii) to make it possible for a child to return safely to the child's home."  As the defendants point out, the Supreme Court held in Suter v. Artist M., 503 U.S. 347, 364 (1992), that "42 U.S.C. § 671(a)(15) neither confers an enforceable private right on its beneficiaries nor creates an implied cause of action on their behalf" and therefore cannot serve as the basis for a private lawsuit.

That is not entirely the end of the story, however. Following the Suter decision, Congress enacted the Improving America's Schools Act of 1994.  See Pub. L. 103-382, 108 Stat. 3518.  This act stated, in relevant part, that:

> In an action brought to enforce a provision of the Social Security Act, such provision is not to be deemed unenforceable because of its conclusion in a section of the Act requiring a State plan or specifying the required contents of a State plan.  This section is not intended to limit or expand the grounds for determining the availability of private actions to enforce State plan requirements other than by overturning any such grounds applied in Suter v. Artist M., 112 S. Ct. 1360 (1992), but not applied in prior Supreme Court decisions respecting such enforceability; provided, however, that this section is not intended to alter the holding in Suter v. Artist M. that section [671(a)(15)] of the Act is not enforceable in a private right of action.

Id. tit. V, part E, § 555(a), 108 Stat. at 4057-58 (codified at
42 U.S.C. § 1320a-2).  As discussed infra, courts have differed
on how to apply § 1320a-2 to various provisions of the Social
Security Act.  They have not differed, however, on how to apply
the express statement that § 1320a-2 "is not intended to alter
the holding of [Suter] that section [671(a)(15)] of the Act is
not enforceable in a private right of action."  See, e.g., Carson
P. ex rel. Foreman v. Heineman, 240 F.R.D. 456, 539 (D. Neb.
2007); Jeanine B. ex rel. Blondis v. Thompson, 877 F. Supp. 1268,
1283 (E.D. Wis. 1995).  That holding, then, is fatal to the
plaintiffs' claim under § 671(a)(15)(B), notwithstanding
§ 1320a-2.  The defendants' motion to dismiss count 4 insofar as
it makes a claim under that section is granted.

     The plaintiffs also seek relief under a different provision
imposing requirements on state foster care plans as a condition
of federal funding, § 671(a)(31).  In relevant part, that
subsection requires that such a plan:

     provide[] that reasonable efforts shall be made--

     (A) to place siblings removed from their home in the
     same foster care . . . unless the State documents that
     such a joint placement would be contrary to the safety
     or well-being of any of the siblings; and

     (B) in the case of siblings removed from their home who
     are not so jointly placed, to provide for frequent
     visitation or other ongoing interaction between the
     siblings, unless the State documents that frequent
     visitation or other ongoing interaction would be

13

> contrary to the safety or well-being of any of the
> siblings[.]

There does not appear to be any case law discussing whether this provision (which is relatively new, having been enacted in 2008, see note 4, supra) implies a private right of action or a right enforceable under § 1983. The defendants argue that § 671(a)(31) does neither. The court agrees.

The Supreme Court has explained that "[a] court's role in discerning whether personal rights exist in the § 1983 context should . . . not differ from its role in discerning whether personal rights exist in the implied right of action context." Gonzaga, 536 U.S. at 285. Thus, "where the text and structure of a statute provide no indication that Congress intends to create new individual rights, there is no basis for a private suit, whether under § 1983 or under an implied right of action." Id. at 286. Moreover, "if Congress wishes to create new rights enforceable under § 1983, it must do so in clear and unambiguous terms--no less and no more than what is required for Congress to create rights enforceable under an implied private right of action." Id. at 290.

As already noted, the Supreme Court held in Suter that "Congress did not intend to create a private remedy for enforcement of the 'reasonable efforts' clause" of § 671(a)(15), which "neither confers an enforceable private right on its

beneficiaries nor creates an implied cause of action on their behalf." 503 U.S. at 364.  In reaching this conclusion, the Court relied on the fact that, aside from the text of the provision itself,

> [n]o further statutory guidance is found as to how 'reasonable efforts' are to be measured.  This directive is the only one which Congress has given to the States, and it is a directive whose meaning will obviously vary with the circumstances of each individual case.  How the State was left to comply with this directive, and with the other provisions of the Act, was, within broad limits, left up to the State.

Id. at 360.  The Court observed that § 671(a)(15)'s "'reasonable efforts' clause is not similarly worded" to other provisions in the AACWA that "impose precise requirements on the States." Id. at 361 n.12 (citing, as an example, 42 U.S.C. § 672(e), which disallows federal payments for a child voluntarily placed in foster care for more than 180 days absent a judicial determination that it is in the child's best interests).

The Court explained that, while it is "well established that Congress has the power to fix the terms under which it disburses federal money to the States" under the Spending Clause of the Constitution, Congress "must do so unambiguously." Id. at 356. Thus, the Court noted, it had previously held that a federal statute, setting conditions on the receipt of federal funds, that "did not provide such unambiguous notice to the States" did not, for that reason, "confer an implied cause of action." Id.

(discussing Pennhurst State Sch. & Hosp. v. Halderman, 451 U.S.
1, 24 (1981)).[5]

The Suter Court also noted that other sections of the ACCWA
"provide enforcement mechanisms for the 'reasonable efforts'
clause of 42 U.S.C. § 671(a)(15)," including a provision
authorizing the Secretary of Health and Human Services "to reduce
or eliminate payments to a State on finding that the State's plan
no longer complies with § 671(a) or that 'there is a substantial
failure' in the administration of a plan such that the State is
not complying with its own plan." Id. at 360 (citing the former
version of 42 U.S.C. § 671(b)).  The Court reasoned that,
"[w]hile these statutory provisions may not provide a
comprehensive enforcement mechanism so as to manifest Congress's
intent to foreclose remedies under § 1983, they do show that the
absence of a remedy to private plaintiffs under § 1983 does not

---

[5]The Court also distinguished § 671(a)(15) from the statute
at issue in Wilder v. Virginia Hospital Ass'n, 496 U.S. 498
(1990), which, at the time, "required that Medicaid providers be
reimbursed according to rates that the State finds, and makes
assurances satisfactory to the Secretary [of Health and Human
Services] are reasonable and adequate to meet the costs of
efficiently and economically operated facilities." Id. at 357
(quotation marks omitted).  In Suter, the Court explained that,
in ruling in Wilder that this statutory requirement "created an
enforceable right, on the part of providers seeking
reimbursement, to challenge the rates set by the State," id., it
had "relied in part on the fact that the statute and [its
implementing] regulations set forth in some detail the factors to
be considered in determining the methods for calculating rates,"
in contrast to the ACCWA. Id. at 359.

make the 'reasonable efforts' clause a dead letter." Id.
(footnotes omitted).

These observations as to the "reasonable efforts" clause of
§ 671(a)(15) apply with equal force to the "reasonable efforts"
clause of § 671(a)(31).  As in the case of § 671(a)(15), the
ACCWA provides no guidance apart from the subsection itself on
what those "reasonable efforts" entail and, indeed,
§ 671(a)(31) contains other "directive[s] whose meaning will
obviously vary with the circumstances of each individual case,"
including an exception for joint sibling placements when they
"would be contrary to the safety or well-being of any of the
siblings," and a provision for "frequent visitation or other
ongoing interaction between the siblings" if they are not jointly
placed.  Like § 671(a)(15), then, § 671(a)(31) is in contrast to
other provisions of the ACCWA--including other provisions of
§ 671(a) itself--that impose more precise requirements on states
as a condition of federal funding.[6]

-------

[6]Significantly, where courts have recognized privately
enforceable rights under particular sections of § 671(a), those
sections set forth more specific requirements.  These include
§ 671(a)(1), which requires a state plan to "provide[] for foster
care maintenance payments in accordance with [§ 672] and for
adoption assistance in accordance with [§ 673]" and § 671(a)(16),
which requires a state plan to "provide[] for the development of
a case plan (as defined in [§ 675(1)]) for each child receiving
foster care maintenance payments under the State plan and
provide[] for a case review system which meets the requirements
described in [§ 675(5)(B)] with respect to each such child."

Furthermore, while the provisions of § 671(b) relied on by
the Suter Court as vesting enforcement authority in the Secretary
of Health and Human Services have since been deleted, they were
replaced by a provision to essentially the same effect. Social
Security Act Amendments of 1994, Pub. L. 103-342, tit. II,
§ 203(b), 108 Stat. 4398, 4454-55 (codified as amended at 42
U.S.C. § 1320a-2a). That statute directs the Secretary, "in
consultation with the State agencies administering the State
programs under parts B and E of subchapter IV of this chapter" to
"promulgate regulations for the review of such programs to
determine whether such programs are in substantial conformity
with State plan requirements under such Parts B and E."[7] 42
U.S.C. § 1320a-2a(a) (formatting altered). The statute further
directs that these rules "specify the method to determine the
amount of any federal matching funds to be withheld due to the

See, e.g., Lynch v. Dukakis, 719 F.2d 504, 512 (1st Cir. 1983)
(ruling, pre-Suter, that § 671(a)(16) conveys privately
enforceable rights); Sam M. ex rel. Elliot v. Chafee, ___ F.
Supp. 2d ___, No. 07-241, 2011 WL 2899213, at *19-*20 (D.R.I.
July 20, 2011) (ruling that §§ 671(a)(1) and 671(a)(16) establish
privately enforceable rights to a case plan and foster care
maintenance payments); Connor B. ex rel. Vigurs v. Patrick, 771
F. Supp. 2d 142, 170 nn. 13-14 (D. Mass. 2011) (observing that a
majority of courts have so concluded). Naturally, this court
need not--and does not--decide here whether other provisions of
§ 671(a) create privately enforceable rights.

[7]The state plan requirements of § 671(a) are included within
Part E of subchapter IV of the Social Security Act. See ACCWA,
Pub. L. 96-272, tit. I, § 101(a)(1), 94 Stat. 500.

State program's failure to so conform."  Id. § 1320a-2a(b)(3).
The Secretary has promulgated such regulations.  See 45 C.F.R.
§§ 1355.33, 1355.56.  Just as in Suter, then, the existence of
other enforcement mechanisms for § 671(a)(31), authorizing the
Secretary to withhold federal payments to a state for failing to
substantially conform to its own plan, suggests that the
provision was not intended to create any private rights.

Of course, reasoning by analogy to Suter is less than
straightforward because of § 1320a-2, the Congressional response
to the decision.  As one court has observed, "courts have not
uniformly interpreted the meaning of § 1320a-2":  some have read
it "as requiring lower courts to apply pre-Suter case law," while
others have rejected that approach.  Carson P., 240 F.R.D. at 538
(citing cases).  Our court of appeals does not appear to have
decided the issue:  in a decision in the wake of the statute, the
court "assume[d] that Congress intended that § 1320a-2 serve to
resurrect the Wilder test, with no Suter overlay," but did not
discuss the issue further.  Visiting Nurse Ass'n of N. Shore,
Inc. v. Bullen, 93 F.3d 997, 1003 n.5 (1st Cir. 1996).[8]  The
court later cited the statute for the more modest proposition

---

[8]Our court of appeals later overruled the holding in
Visiting Nurse Ass'n as having been abrogated by the Supreme
Court's subsequent decision in Gonzaga.  See Long Term Care
Pharmacy Alliance v. Ferguson, 362 F.3d 50, 59 (1st Cir. 2004).

that "[t]he mere fact that . . . laws are embedded within the requirements for a state plan does not, by itself, make all of the . . . provisions into ones stating a mere institutional policy or practice rather than creating an individual right." Rio Grande Cmty. Health Ctr. v. Rullan, 397 F.3d 56, 74 (1st Cir. 2005). As another district court in this circuit recently observed, this reflects the majority view. See Sam M., 2011 WL 2899213, at *18 (citing Carson P., 240 F.R.D. at 538).

The plaintiffs themselves seem to endorse the majority interpretation of § 1320a-2.[9] And this court finds that interpretation of § 1320a-2 persuasive because, if for no other reason, it hews most closely to the language of the statute, which is the beginning--and often the ending--point for interpretive analysis. See, e.g., Ruiz v. Bally Total Fitness Holding Corp., 496 F.3d 1, 8 (1st Cir. 2007) (citing United States v. Ron Pair Enters., 489 U.S. 235, 241 (1989)). Again,

_____

[9]In their objection the plaintiffs quote a case--without disagreeing with it--that "the purpose of [§ 1320a-2] was simply to clarify 'that the mere fact that an obligation is couched in a requirement that the State file a plan is not itself sufficient grounds for finding the obligation unenforceable under § 1983'" (quoting Harris v. James, 127 F.3d 993, 1003 (11th Cir. 1997)). They do cite another opinion that they say "appears to apply the Wilder analysis," but that case expressly did not reach the question of whether the statute there implied a private right of action, and did not even mention § 1320a-2. See Rodriguez ex rel. Rodriguez v. DeBuono, 162 F.3d 56, 61-62 (2d Cir. 1998), amended and superseded, 175 F.3d 227 (2d Cir. 1999).

the first sentence of § 1320a-2 states simply that a provision of the Social Security Act "is not to be deemed unenforceable because of its inclusion in a section of the Act requiring a State plan or specifying the required contents of a State plan." The only other effect the statute purports to have on judicial decisions as to the private enforceability of Social Security Act requirements is to "overturn[] any such grounds applied in [Suter], but not applied in prior Supreme Court decisions respecting such enforceability."

This clause does not, by its terms, require a return to "pre-Suter case law."  To the contrary, it allows courts to follow Suter except insofar as it applied "grounds for determining the availability of private actions to enforce State plan requirements" not applied in the Court's prior decisions.[10] See Harris, 127 F.3d at 1002 ("Section 1320a-2 does not purport to reject any and all grounds relied upon in Suter; it purports only to overrule certain grounds.")  And the only such "grounds" the statute itself identifies are the placement of the provision in question in "a section of the [Social Security] Act requiring

---

[10]Nor does § 1320a-2 state that there even were any such grounds--and, indeed, two circuit courts interpreting § 1320a-2 have suggested that there were not.  See White v. Chambliss, 112 F.3d 731, 739 n.4 (4th Cir. 1997); LaShawn A. v. Barry, 69 F.3d 556, 570 (D.C. Cir. 1995), vacated and superseded on unrelated grounds, 87 F.3d 1389 (D.C. Cir. 1996) (en banc).

a State plan or specifying the required contents of a State plan." So, as one court has observed, "most courts hold that if § 1320a-2 effectively overruled anything in Suter, it overruled only that portion of the opinion identifying and allowing a court to rely exclusively on the 'state plan' criteria in determining the existence of a federal right" enforceable through private action. Carson P., 240 F.R.D. at 538-39 (citing cases from five different federal courts of appeals, including Rio Grande).

Under this majority interpretation of § 1320a-2, the statute does not prevent this court from concluding, based on the aspects of Suter just discussed at length, that § 671(a)(31) creates no privately enforceable rights. Those aspects of Suter--that the absence of a clear standard and the presence of other enforcement mechanisms in a federal statute indicate that Congress did not intend it to bestow such a right--were left unscathed by § 1320(a)(2), at least under the majority view.

Furthermore, even if § 1320(a)(2) does, as a minority of courts have ruled, require them to "rewind the clock and look to cases prior to Suter to determine the enforceability of other provisions under the [AACWA]," Jeanine B., 877 F. Supp. at 1283, even those Supreme Court cases foreclose the conclusion that § 671(a)(31) creates a privately enforceable right. That much is clear from the Supreme Court's more recent decision in Blessing

v. Freestone, 520 U.S. 329, 340-41 (1997), which set forth
factors to which the Court has "traditionally looked . . . when
determining whether a particular statutory provision gives rise
to a federal right"--and did so, coincidentally or not, with
reference solely to pre-Suter case law.  Of particular relevance
here, the Court held that "the plaintiff must demonstrate that
the right assertedly protected by the statute is not so 'vague
and amorphous' that its enforcement would strain judicial
competence," id. (quoting Wright v. City of Roanoke Redev. &
Hous. Auth., 479 U.S. 418, 431-32 (1987)), and that "the
provision giving rise to the right must be couched in mandatory,
rather than precatory terms," id. at 341 (citing Wilder, 496 U.S.
at 510-11 and Pennhurst, 451 U.S. at 17).

For the reasons already discussed, § 671(a)(31) flunks these
tests.  First, trying to enforce the right for which the
plaintiffs invoke it--"reasonable efforts . . . to place siblings
removed from their home in the same foster care unless the State
documents that such a joint placement would be contrary to the
safety or well-being of any of the siblings"--would "strain
judicial competence," because the right would be "vague and
amorphous."  Second, while the plaintiffs emphasize the mandatory
language of § 671(a)(31)--"that reasonable efforts shall be
made"--that provision cannot be read in isolation.  The section

23

of the Social Security Act empowering the Secretary to enact
regulations to review state foster care programs, as discussed
supra, allows those regulations to provide for the withholding of
funds only if "the program fails substantially to . . . conform"
with, among other requirements, those of § 671(a). 42 U.S.C.
§ 1320a-2a(b)(3)(A) (emphasis added).[11]  The Supreme Court held
in Gonzaga that the similar structure of another federal statute,
under which recipients can "avoid termination of funding so long
as they comply substantially" with listed criteria, also failed
to "make out the requisite congressional intent to confer
individual rights enforceable by § 1983." 536 U.S. at 288
(quotation marks omitted).

     Taken separately, then, the inspecific standard of
§ 671(a)(31) and the "substantial conformity" test used by the
Secretary in enforcing it both contraindicate any congressional
intent that the provision create privately enforceable rights.
Taken together, though, they make that conclusion even stronger.
As our court of appeals has observed, finding no privately
enforceable right in a Medicaid Act requirement that a state plan
"provide such methods and procedures . . . to assure that

---

[11]Even in the case of a lack of substantial compliance, the
Secretary is empowered to revoke federal funding only after he
"afford[s] the State an opportunity to adopt and implement a
corrective action plan, approved by the Secretary, designed to
end the failure to so conform." 42 U.S.C. § 1320a-2a(b)(4)(A).

payments are consistent with efficiency, economy, and quality of care," 42 U.S.C. § 1396a(a)(A)(30), "the generality of the goals and the structure for implementing them suggests [*sic*] that plan review by the Secretary is the central means of enforcement intended by Congress." Long Term Care, 362 F.3d at 58 (citing Gonzaga, 536 U.S. at 292 (Breyer, J., concurring)).  Justice Breyer explained in his Gonzaga concurrence that such a scheme expresses a preference for "the expertise, uniformity, wide-spread consultation, and resulting administrative guidance that can accompany agency decisionmaking" over "the comparative risk of inconsistent interpretations and misincentives that can arise out of an occasional inappropriate application of the statute in a private action." 536 U.S. at 292.

Importantly, this reasoning is unaffected by § 1320a-2, even under the minority view that it restricts courts to pre-Suter case law in analyzing Social Security Act provisions for privately enforceable rights.  Again, Blessing set forth the relevant requirements for finding such a right--that it be set forth in unambiguous and mandatory terms--solely by reference to the Court's pre-Suter case law.  Long Term Care applied these requirements in ruling that a provision of the Medicaid Act (which, as the case recognizes, is part of the Social Security

Act, see 362 F.3d at 51) did not create privately enforceable rights, albeit without specifically discussing § 1320a-2.

Other courts of appeals have followed suit.  The court in Watson v. Weeks, 436 F.3d 1152, 1162-63 (9th Cir. 2006), held, while acknowledging § 1320a-2, that another provision of the Medicaid Act (requiring that "a state plan for medical assistance must include reasonable standards for determining eligibility" (parenthetical omitted)) did not create a privately enforceable right because "it is too vague and amorphous for judicial enforcement."[12]  The court in 31 Foster Children v. Bush, 329 F.3d 1255, 1272 (11th Cir. 2003), also while acknowledging § 1320a-2, held that other provisions of § 671(a) itself did not create privately enforceable rights because of the "substantial conformity" standards of § 1320a-2a.

So, even if § 1320a-2 does require courts to apply only the Supreme Court's pre-Suter case law in deciding whether provisions of the Social Security Act create privately enforceable rights, that case law compels the conclusion that § 671(a)(31) does not

---

[12]Watson also distinguished Wilder on the ground that the term "reasonable and adequate," as the statutory requirement for the states' rates of reimbursement to Medicaid providers, was "objective and thus judicially manageable because the statute tied it to a benchmark of the 'efficiently and economically operated facility.'"  436 F.3d at 1163.  The statute at issue in Watson, like § 671(a)(31), contained no similar benchmark.  Thus, even without regard to Suter, Wilder does not support the plaintiffs' position here.

do so.  The provision's text and surrounding structure simply
"provide no indication that Congress intend[ed] to create new
individual rights."  Gonzaga, 536 U.S. at 286.  The defendants'
motion to dismiss count 4 insofar as it asserts a claim under
that provision is granted.


    **b.   Section 622(b)(7)**

    For nearly identical reasons, the third section of the
Social Security Act invoked by the plaintiffs, 42 U.S.C.
§ 622(b)(7), also does not create any privately enforceable
rights.[13]  That provision appears in a list of requirements that
a state's "plan for child welfare services" must have "[i]n order
to be eligible for payment under this subpart," id. § 622(a),
which makes allotments for public welfare programs, id. § 623(a).
Section 622(b)(7) provides that such a plan shall "provide for
the diligent recruitment of potential foster and adoptive
families that reflect the ethnic and racial diversity of children
in the state for whom foster and adoptive homes are needed."

    The term "diligent recruitment" provides no more guidance or
notice to states on what is required of them than the term
"reasonable efforts" in §§ 671(a)(15) and (31).  Furthermore,

---

    [13]This provision was enacted as part of the Howard M.
Metzenbaum Multiethnic Placement Act of 1994, Pub. L. 103-382,
tit. V, part E, § 554, 108 Stat. 4056, 4057.

like § 671(a)(31), § 622(b)(7) contains other phrases ("potential
foster and adoptive families," "the ethnic and racial diversity
of children in the state") that defy ready definition, or
judicial application, but are left undefined by the statute.
Also like §§ 631(a)(15) and (31), § 622(b)(7) is contained within
a part of the Social Security Act (part E of subchapter 4, see
note 13, supra) that is enforceable by the Secretary under
§ 1320a-2a--which, again, limits his ability to withhold funds to
cases where "substantial conformity" with federally mandated
state plan requirements is lacking, see 42 U.S.C. §§ 1320a-
2(a)(1), (b)(3)(A).  Accordingly, § 622(b)(7) fails to create any
privately enforceable rights for the same reason that
§ 631(a)(31) fails to do so--and, as in the case of
§ 631(a)(31), this conclusion holds whether or not § 1320a-2 is
read to restrict the analysis to pre-Suter case law.  See Charlie
H. v. Whitman, 83 F. Supp. 2d 476, 494 n.6 (D.N.J. 2000)
(observing that a claim under § 622(b)(7) "would be too vague and
amorphous to lend itself to proper judicial administration").[14]

---

[14]While the plaintiffs do not provide any authority that
§ 622(b)(7) creates privately enforceable rights, this court's
research revealed one case coming to that conclusion.  See
Marisol A. ex rel. Forbes v. Giuliani, 929 F. Supp. 662, 683
(S.D.N.Y. 1996).  In ruling that § 622(b)(7), as well as
provisions of § 671(a) not at issue here, had that effect, the
Marisol A. court found that "the language of these provisions is
mandatory and sets forth the requirements that the state must
meet to be eligible for funding" and that "[n]one of these

The defendants' motion to dismiss count 5, which asserts their
violation of § 622(b)(7), is granted.


**C.    The claim for "negligent and reckless infliction of
        emotional distress"**

Finally, the defendants have moved to dismiss the
plaintiffs' claim for "negligent and reckless infliction of
emotional distress."  As described in Part II, <u>supra</u>, SK claims
that the defendants caused her emotional distress, not only by
removing her children from her home, but also by failing to
intervene in the foster families' violations of the children's
religious beliefs, and also by interfering in the children's
visits to her in the hospital.  The defendants argue that the
plaintiffs have not stated a claim for negligent infliction of
emotional distress because, among other things, they have failed
to establish that the defendants owed a duty to SK.

The defendants are correct on that point.  There is no
question that a claim for negligent infliction of emotional
distress, like any other negligence claim, demands the existence

---

provisions is so vague and amorphous as to be beyond the
competence of this court to enforce."  For the reasons just
discussed at length, however, this court disagrees with those
findings, at least as they respect § 622(b)(7).  It is also worth
noting that Marisol A. was decided prior to Gonzaga which, as the
court of appeals has pointed out, marked at least "a shift in
emphasis" in analyzing statutes for privately enforceable rights.
Long Term Care, 362 F.3d at 59.

of a duty from the defendant to the plaintiff.  See Corso v. Merrill, 119 N.H. 647, 651-54 (1979).  As this court has previously observed, public agencies and their employees do not acquire a duty to a parent by taking custody of his or her child; they acquire a duty to the child.[15]  See Brodeur v. Claremont Sch. Dist., 626 F. Supp. 2d 195, 226 n.32 (D.N.H. 2009).  Aside from the defendants' responsibility for the children (and, it should be noted, even the extent of that is unclear from the amended complaint), the plaintiffs suggest no basis for any duty between SK and any of the defendants that could support a negligent infliction of emotional distress claim.[16]  The defendants' motion to dismiss count 6 is granted.

---

[15]The amended complaint does not assert the "negligent or reckless infliction of emotional distress claim" on behalf of any plaintiff but SK (there is a statement to the effect that it "was upsetting" to one of the children, B, when her foster parents declined SK's advice on how to care for B when she was sick, but none of the defendants is alleged to have participated in that exchange, and the foster parents are not named as defendants).

[16]The allegation that the defendants were "reckless" in inflicting emotional distress does not substitute for an allegation of any duty to SK.  In their objection to the motion to dismiss, the plaintiffs suggest that the defendants' infliction of emotional distress was "intentional," but that is not the claim pled in the amended complaint.

IV.   **Conclusion**

For the foregoing reasons, the defendants' reinstated motion to dismiss (document no. 43) is GRANTED as to counts 4-6 of the amended complaint, but DENIED as to counts 1-3.  Because the defendants have already answered the amended complaint, <u>see</u> note 1, <u>supra</u>, the parties shall confer and submit a joint discovery plan as required by Fed. R. Civ. P. 26(f) and L.R. 26.1 by **October 14, 2011.**  The court will not hold a preliminary pretrial conference.

**SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge

Dated:  September 30, 2011

cc:  Nancy Sue Tierney, Esq.
     B.K., pro se
     Karen A. Schlitzer, Esq.

31