```
                    UNITED STATES DISTRICT COURT
                     DISTRICT OF NEW HAMPSHIRE


BK

     v.                                   Civil No. 09-cv-94-JL
                                          Opinion No. 2012 DNH 192
Nicholas Toumpas et al.
```

### SUMMARY ORDER

This case raises the important, and potentially difficult, issue of whether state authorities violate parents' free exercise rights by placing their children with foster families who subject children to practices at odds with their religious upbringing. Through the sole remaining claim, "BK," proceeding pro se as well as pseudonymously, seeks to recover monetary damages against the defendants (the director and several employees of the New Hampshire Department of Health and Human Services and its Division for Children, Youth, and Families) under 42 U.S.C. § 1983. He alleges that, after he temporarily lost custody over his three minor children, the defendants knowingly placed or left the children in the homes of foster families who served them beef and took them to Christian religious services--practices abhorrent to their upbringing in the Hindu faith. This court has jurisdiction under 28 U.S.C. § 1331 (federal question).

The defendants have moved for summary judgment.  See Fed. R. Civ. P. 56.  They argue that:

>  (1) any rational factfinder would have to conclude that, in handling the children's foster care placements, the defendants made "reasonable efforts" to ensure that BK's "religious preferences [were] respected," so that no Free Exercise violation occurred;
>
>  (2) in any event, they are entitled to qualified immunity, because no reasonable official in their position would have known he or she was violating the plaintiffs' clearly established free exercise rights;
>
>  (3) certain of the defendants were not personally involved in any deprivation of those rights, even if there was one, and
>
>  (4) BK has failed to respond to any of the defendants' discovery requests, including requests for admissions, see Fed. R. Civ. P. 36, warranting dismissal of his case as a sanction.

Because, for the reasons discussed infra, the court rules that the defendants are entitled to qualified immunity, it need not and does not reach their other arguments for summary judgment.

**Procedural background**

Before addressing the merits of the qualified immunity argument, however, the court pauses to review the complicated procedural travail of this case so as to make clear exactly what claims remain for disposition on summary judgment.  The original complaint, consisting of seven separately numbered counts against eight separately named defendants, was filed by counsel on behalf

2

of BK, and his then-wife "SK," both individually and in their capacity as guardians and next friends of their three minor children, "M," "K," and "B."  After the defendants moved to dismiss the complaint in its entirety for failing to state a claim for relief, see Fed. R. Civ. P. 12(b)(6), the plaintiffs filed an amended complaint dropping one of the counts and modifying others.  Neither the original nor the amended complaint made any claim against any of the foster parents.

Before the court ruled on the motion to dismiss, counsel for the plaintiffs sought leave to withdraw from her representation of BK, stating that SK's seeking a legal separation from him created a conflict of interest for counsel.  The plaintiffs also sought a stay of the action to enable BK to secure new counsel.  This relief was granted without objection.  After being advised that BK had traveled to India without leaving word as to whether he had found a lawyer to appear for him in this case, the court administratively closed it, ordering a status report to be made every 90 days.  Order of Dec. 8, 2009.

The case remained closed until the following September, when the defendants informed the court that they had received word that BK was "prepared to proceed pro se and will continue to attempt to obtain counsel."  Acting on a subsequent motion by BK, the court allowed him additional time to find an attorney, but

3

ordered that the case would proceed on January 1, 2011 regardless.  Order of Nov. 30, 2010.  After that date passed without the appearance of new counsel for BK, the defendants reinstated their motion to dismiss, which had been denied without prejudice as a result of the stay, and the plaintiffs reinstated their objection.  Following further briefing, as well as oral argument--at which BK appeared pro se--the court granted the defendants' motion to dismiss except as to the plaintiffs' claims alleging violations of their First Amendment rights.  BK v. N.H. Dep't of Health & Human Servs., 814 F. Supp. 2d 59 (D.N.H. 2011).  The defendants later filed a motion for judgment on the pleadings, see Fed. R. Civ. P. 12(c), arguing that the Eleventh Amendment barred plaintiffs' claims against HHS, DCYF, and the other defendants in their official capacities.  The court granted that motion, and also dismissed, without prejudice, all remaining claims by one of the children, K, who had reached the age of majority since the lawsuit was filed and no longer wished to pursue it.  Order of Mar. 7, 2012.

A few months later, counsel for SK sought leave to withdraw from representing her, saying that the task had become unreasonably difficult due to BK's interference.  BK, but not SK, filed a response, purporting to object to SK's counsel's withdrawal.  While that request was pending, the defendants filed

their motion for summary judgment on all of the plaintiffs' remaining claims. The court later granted SK's counsel "leave to withdraw from her representation of SK, both in her individual capacity and in her capacity as the guardian of certain of her minor children who are also named as plaintiffs here." Order of June 22, 2012. In light of the defendants' pending summary judgment motion, however, the court ruled that counsel for SK could not withdraw immediately, but only upon "the filing of SK's response to the summary judgment motion." Id. The court also granted SK's request for additional time to respond to the defendants' motion for summary judgment, and "strongly advised" SK "to begin efforts to find replacement counsel immediately, in the event the motion for summary judgment is denied and the case proceeds to trial." Id.

Thus, after SK, through counsel, filed an objection to the summary judgment motion, her counsel withdrew from the case.[1] Prior to that point, the court had ordered SK to advise it by

---

[1]BK has never filed any response to the summary judgment motion. Regardless, the court cannot simply grant the motion as unopposed, but "must assure itself that the moving party's submission shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." NEPSK, Inc. v. Town of Houlton, 283 F.3d 1, 7 (1st Cir. 2002) (quotation marks omitted). In discharging this duty, the court has given full consideration to SK's summary judgment objection, filed by counsel before she withdrew.

August 17, 2012, "of the name of a new attorney or, in the alternative, of [her] decision to appear pro se," warning her that "[i]f no new appearance or other response is received within the time specified, the file will be referred to the clerk for entry of default." Order of July 3, 2012. Before that deadline arrived, however, the court granted yet another motion by BK to stay the case, this time until September 5, 2012. Order of August 13, 2012. After this stay expired, the court issued an order reminding SK that she "was previously directed to either provide the name of a new attorney or a pro se appearance," and directed her to do so "within 10 days of this order. Failure to comply with this order may result in dismissal." Order of Sept. 27, 2012. After SK failed to respond, the court dismissed her from the action without prejudice. Order of Oct. 15, 2012.

**<u>Analysis</u>**

The only claims left in the case, then, are BK's claims against the remaining defendants under § 1983. As set forth in the amended complaint at counts 1-2, these claims allege that the defendants violated the plaintiffs' First Amendment rights (specifically, their "right of freedom of religion") in that:

> (1) despite the children's upbringing "in a home in which the cow was treated as a sacred animal," the defendants--who had been "informed of the plaintiffs' religious beliefs"--placed the children in foster homes

6

>    "which did not recognize the plaintiffs' religious
>    beliefs and which, in fact, violated them by cooking,
>    consuming and serving beef," and, "[w]hen confronted
>    with this violation," refused to move the children to
>    different homes, and rejected SK's offer "to cook and
>    supply food for the children to ensure that the meals
>    they were eating did not violate their religious
>    beliefs"; and
>
>    (2) "[k]nowing she and her family were members of the
>    Hindu faith," and despite BK's and SK's objection, the
>    defendants "placed K in the home of a practicing
>    minister," who later took her to his church; B's foster
>    family took her to the same church.

Count 3 alleges that "placing the children in a home where they were not permitted nor able to follow their religious diet" and "[p]lac[ing] K in the home of a minister . . . who involved K with the church . . . burdened [the children's] ability to exercise their religion."  As such, this count appears to invoke the Free Exercise rights of the children, rather than those of BK.  The claims brought on behalf of the children, however, have all been dismissed:  K's claims were dismissed without prejudice when she informed the court she no longer wished to pursue them, while the other children's claims were dismissed without prejudice when SK--who had brought those claims in her capacity as the children's next friend and guardian--was dismissed from the case for failing to respond to this court's orders.[2]  The

---

   [2]While BK also purported to appear as the children's next friend and guardian, his continued authority to do so is unclear, given the statements by plaintiffs' former counsel in her first

7

only remaining counts are counts 1 and 2 of the amended complaint insofar as they allege that the defendants violated BK's right to religious freedom under the First Amendment.

The court agrees with the defendants that they enjoy qualified immunity from these claims. "Qualified immunity shields . . . state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a constitutional or statutory right and (2) that the right was clearly established at the time of the challenged conduct." Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2080 (2011) (quotation marks omitted). For a right to be "clearly established" for purposes of this inquiry, "[t]he contours of the right must have been sufficiently clear that a reasonable official would understand what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law

---

motion to withdraw that SK was seeking a legal separation from BK and that "[t]he minor children will remain with SK." In any event, while BK can litigate his own claims pro se, he cannot litigate the children's claims in that capacity, because the children "cannot authorize another person who is not a member of the bar of this court to appear on [their] behalf." L.R. 83.6(b); see also Herrera-Venegas v. Sanchez-Rivera, 681 F.2d 41, 42 (1st Cir. 1982) ("By law an individual may appear in federal courts only pro se or through legal counsel," and not through "third-party lay representation").

the unlawfulness must be apparent." Anderson v. Creighton, 483 U.S. 635, 640 (1987) (citations omitted).

Even assuming, dubitante, that the defendants' actions in first placing, and then leaving, BK's children in foster homes where they were subjected to practices at odds with their religious upbringing violated his right to free exercise, the unconstitutionality of those actions would not have been clear to a reasonable official at that time (or, indeed, even now). It is clear, of course, that the Free Exercise clause protects "traditional concepts of parental control over the religious upbringing and education of their minor children." Wisconsin v. Yoder, 406 U.S. 205, 231 (1972). Indeed, the Supreme Court has repeatedly recognized "[t]he rights of children to exercise their religion, and of parents to give them religious training and to encourage them in the practice of religious belief, as against preponderant sentiment and assertion of state power voicing it." Prince v. Massachusetts, 321 U.S. 158, 165-66 (1944) (citing cases). These rights, however, are not absolute: the state retains "a wide range of power for limiting parental freedom and authority in things affecting the child's welfare; and this includes, to some extent, matters of conscience and religious conviction." Id. at 167.

So, by way of example, the Supreme Court has ruled that the Free Exercise clause does not prevent states from enforcing child labor laws against parents who cause their children to proselytize in public places, id. at 170, but it does prevent states from enforcing compulsory public school attendance laws against parents whose religion forbids formal schooling beyond the eighth grade, Yoder, 406 U.S. at 234, or whose religion dictates that children attend private schools where they can "receive appropriate mental and religious training," Pierce v. Soc'y of Sisters, 268 U.S. 510, 532-35 (1925).  But the Supreme Court has never considered whether the Free Exercise clause prevents states from placing children with foster families whom state officials know, or have reason to know, will subject the children to practices at odds with their religious upbringing.[3]

Despite this, a few federal courts have held, or at least suggested, that "parents' wishes with regard to their children's religious training while in state custody are afforded some constitutional protection." Bruker v. City of N.Y., 92 F. Supp. 2d 257, 267 (S.D.N.Y. 2000); see also Pflotzer v. County of Fairfax, 996 F.2d 1443 (table), 1992 WL 137512 (4th Cir. 1992) (unpublished disposition) ("With respect to children in foster

---

[3]Nor, for that matter, has our court of appeals.

care, a state is required to make reasonable efforts to accommodate the parent's religious preferences."); Starkey v. Miller, No. 06-659, 2007 WL 4522702, at *12 (D. Colo. Dec. 17, 2007) (same); Walker v. Johnson, 891 F. Supp. 1040, 1049 (M.D. Pa. 1995) (recognizing parents' "limited rights to control the religious upbringing" of a child in foster care).  As authority for this view, these courts have relied on (in addition to each other) the decision by the Second Circuit Court of Appeals in Wilder v. Bernstein, 848 F.2d 1338 (2d Cir. 1988).  In this court's estimation, however, it is at best unclear whether Wilder supports this view of the law.

The court in Wilder rejected challenges to "the settlement of a class action that effect[ed] major changes in the way New York City discharges its obligations to arrange for the care of children requiring placement in institutions and foster homes." Id. at 1340.  As originally filed, the class action alleged that "state law provisions regarding religious matching in connection with publicly funded child care placements"--under which the majority of the foster children in the city were placed in institutions run by religiously affiliated private agencies--ran afoul of the Establishment Clause.  Id. at 1342.

In relevant part, these provisions required placing a foster child, when "practicable," in the custody of a person of the same

11

religious faith, and "so as to give effect to the religious wishes of the parents." Id. at 1341-42 (quotation marks omitted). In rejecting a facial challenge to these provisions, the district court reasoned that they protected "the parents' right to determine the religious upbringing of their children" as well as "the children's rights under the Free Exercise clause," and, as a result, that "countervailing circumstances" eliminated any wholesale Establishment Clause problem. Id. (quotation marks omitted). The plaintiffs then amended their complaint, adding (among others) a claim that the foster care program "infringed on the Free Exercise rights of Protestant children in that . . . there are no [foster care] agencies operated by members of most of the Protestant sects and that Protestant children are chilled in the exercise of their own religion when placed in the care of Catholic and Jewish agencies." Id. at 1343. Significantly, there was no claim that this aspect of the scheme violated the Free Exercise rights of the <u>parents</u> of these children.

In any event, the district court never reached any further decision on the merits of any of the claims, because the parties settled them. Id. Under the settlement's relevant provisions, "[i]f the parents express a preference for a religious matching placement, the City will be required to place the child in the best available program of an agency with the preferred religious

affiliation, provided there is a vacancy." Id. at 1344. In cases of no such vacancy, the settlement gave the parents "a three-fold option" of waiting for the preferred program, enrolling in "the next best 'in-religion' program," or enrolling in the "best available out-of-religion program." Id. The settlement also--"to meet concerns arising under the Free Exercise clause"--required every foster care agency to agree, in its contract with the City, to "provide comparable opportunities for children to practice their own religion and observe religious holidays, [to] permit but not require children in its care to attend religious or holiday observances on its premises, [and not to] impose religious dietary practices (to the extent practicable) on children who do not wish to follow them." Id.

Several of the religiously affiliated foster care agencies challenged the settlement on a number of grounds, including that "it infringe[d] the free exercise rights of children and their parents." Id. at 1345. In rejecting this challenge, the court of appeals expressed "difficulty . . . in understanding precisely what respect [the agencies] contend that parents or children are likely to be denied their rights under the Free Exercise clause. Manifestly, nothing in the settlement in any way purports to impair the right of any person to maintain his or her religious beliefs." Id. at 1346. The court further observed that, while

13

the settlement had a "tendency to reduce the frequency of in-religion placements," the agencies did not argue

> that every child in need of institutional or foster care has a constitutional right to have that care provided by an agency of the child's religion. The context in which this lawsuit arose and has been settled differs significantly from Pierce v. Society of Sisters, supra. It is one thing to recognize the right of parents to choose a religious school for their children as a private alternative to meeting state-imposed educational requirements in public schools. It is quite another matter, however, to suggest that parents who are unable to fulfill their parental obligations, thereby obligating the state to act in their stead . . . nonetheless retain the constitutional right to insist that their children receive state-sponsored parenting under the religious auspices preferred by the parents. So long as the state makes reasonable efforts to assure that the religious needs of the children are met during the interval in which the state assumes parental responsibilities, the free exercise rights of the parents and their children are adequately observed.

Id. at 1346-47.

This court has serious difficulty reading that passage as a statement of law that the Free Exercise clause requires a state to make "reasonable efforts" to accommodate parents' religious preferences when placing their children in foster care. The Wilder court's remark that the state's "reasonable efforts to assure that the religious needs of the children are met" while in foster care would "adequately observe" the Free Exercise rights of the children and their parents is not necessarily an endorsement of the converse proposition, i.e., that a state's

14

failure to use such efforts would violate the Free Exercise rights of the children, let alone their parents.  Indeed, the court expressly rejected the view that parents who temporarily lose custody of their children to the foster care system "nonetheless retain the constitutional right to insist that their children receive state-sponsored parenting under the religious auspices preferred by the parents."  Furthermore, the court did not identify any authority, or even provide any reasoned argument, to support a conclusion that the Establishment Clause conveys upon parents a "right" to the state's "reasonable efforts" toward accommodating their religious preferences when placing their children in foster care (to the contrary, the court distinguished Pierce, one of the leading Supreme Court cases limiting state power to provide for the welfare of children over parents' religious objections).

This is all unsurprising, because the court in Wilder was not squarely confronted with a claim--like the one remaining in this case--by a parent that a state had violated his right to free exercise by failing to make reasonable efforts at accommodating his religious preferences when placing his child in foster care.  Instead, the court was presented with, and rejected, an argument that a state program's "tendency to reduce the frequency of in-religion placements" of foster children could

15

violate the Free Exercise rights of their parents, ruling, again, that those rights did not include "state-sponsored parenting under the religious auspices preferred by the parents." In this context, it is exceedingly difficult to take the court's observation that the settlement "adequately observed" the parents' Free Exercise rights through its "reasonable efforts to assure that the religious needs of the children are met" as a holding that, absent its provisions for such efforts, the settlement would have violated those rights. It is even more difficult to derive the proposition that the Free Exercise clause requires the state to expend such efforts every time it places a child with a foster family.

The long and short of it is that, whatever the proper interpretation of Wilder, neither it nor the handful of court cases purporting to apply it serve to give the defendants here "fair warning that their conduct violated [BK's] constitutional rights." Jennings v. Jones, 499 F.3d 2, 16 (1st Cir. 2007) (quotation marks omitted). These cases neither "ruled that materially similar conduct was unconstitutional" nor set forth "a general constitutional rule" that "applies with obvious clarity to the specific conduct at issue" in this case. Id. (quotation marks and bracketing omitted).

To the contrary, with one exception, every reported case identified by the parties, or located by the court, as applying the "reasonable efforts" test has ruled that the defendant child welfare officials met it and, as a result, no violation of the parents' (or children's) free exercise rights occurred. See Wilder, 848 F.2d at 1346-47; Pfoltzer, 1992 WL 137512, at *6; Starkey, 2007 WL 4522702, at *12; Walker, 891 F. Supp. at 1049; but see Bruker, 92 F. Supp. 2d at 267-68 (denying motion to dismiss mother's Free Exercise claim arising out of child welfare officials' lack of "effort to place [the child] in a Jewish home," despite a state court order).[4]  Furthermore, authorities

---

[4] In a subsequent opinion denying the defendants' motion for summary judgment on this claim, the court in Bruker, after discussing Wilder, Pflotzer, and Walker, announced that the "reasonable efforts" that the Free Exercise clause requires of child welfare officials include "placing a child with a family of the same religion where doing so is practicable and in the child's best interest and ensuring that the foster family is instructed regrading the child's religious needs" as well as "some measure of supervision of the foster family's success in enabling the child's religious practices, particularly if an in-religion placement is not possible." Bruker v. City of N.Y., 337 F. Supp. 2d 539, 551 (S.D.N.Y. 2004).  This court cannot accept the view that the Free Exercise clause imposes this highly specific--and potentially quite onerous--set of requirements on state child welfare officials, and, again, Wilder expressly disclaims such a strict reading.  In any event, a single decision from another district court does not provide the "fair warning" of clearly established law necessary to overcome the defendants' qualified immunity defense.  See Lynch v. City of Boston, 180 F.3d 1, 14 (1st Cir. 1999) (ruling that a single decision by another court, applying precedent from outside this circuit, "is plainly insufficient" to overcome qualified immunity); cf. al-

have recognized that, given the fact-specific nature of the "reasonable efforts" inquiry, "these cases do not provide a great deal of concrete guidance" in resolving Free Exercise claims arising out of foster care placements. Bruker, 337 F. Supp. 2d at 551; see also Kelsi Brown Corcoran, Free Exercise in Foster Care: Defining the Scope of Religious Rights for Foster Children and Their Families, 72 U. Chi. L. Rev. 325, 353 (2005) (noting that, under the reasonable efforts test, "many gray areas exist between reasonableness and unreasonableness").

The Supreme Court recently instructed that, to overcome qualified immunity, "existing precedent must have placed the . . . constitutional question beyond debate." al-Kidd, 131 S. Ct. at 2083. For the reasons just discussed, Wilder and its progeny hardly establish beyond debate that the Free Exercise clause bestows on parents the right to reasonable efforts towards accommodating their religious preferences when the state places their children in foster care.[5] So, whether or not the

---

Kidd, 131 S. Ct. at 2083-84 (holding that, "absent controlling authority[,] a robust consensus of cases of persuasive authority" is necessary to overcome qualified immunity).

[5] Indeed, SK states in her objection to the summary judgment motion that, as to parents' rights to control their childrens' religious upbringing, "there is disagreement as to the extent of the limitations, if any, placed on those rights when the children are placed in foster care" (emphasis added).

defendants' complained-of actions here amounted to reasonable efforts at such an accommodation, the defendants are entitled to qualified immunity from BK's claims against them for money damages under § 1983 (which, as already discussed, are the only claims remaining in the case).

As a result, the defendants' motion for summary judgment (document no. 84) is GRANTED as to BK's claims, and DENIED as moot as to the § 1983 claims against the individual defendants by SK (on her own behalf, as well as on behalf of the children) since those claims have been dismissed without prejudice. All other pending motions are DENIED as moot, and the upcoming final pretrial conference and trial are CANCELLED. The clerk of court shall enter judgment accordingly and close the case.

**SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge

Dated:  November 14, 2012

cc: B.K., pro se
    Jeanne P. Herrick, Esq.
    Nancy J. Smith, Esq.